THE REIDUN.

No. 3261.

District Court, E. D. New York.

April 23, 1936.

Leo J. Hickey, U. S. Atty., of Brooklyn, N. Y. (Vine H. Smith, Asst. U. S. Atty., of Brooklyn, N. Y., of counsel), for libelant United States of America, and respondent Harry M. Durning, individually and as Collector of the Port of New York.

Bigham, Englar, Jones & Houston, of New York City (James W. Ryan, of New York City, of counsel), for owners of The Reidun.

GALSTON, District Judge.

This matter comes before the court on exceptions by the claimants of the Norwegian steamship Reidun to the libel of the United States, which seeks forfeiture of the vessel; and on exceptions of the owners to the answer of the United States to the possessory libel of the owners.

It appears that the Reidun sailed from Antwerp, Belgium, on October 23, 1935, with a general cargo including approximately 20,000 cases of Belgian alcohol, and with clearance for ports in Newfoundland and other Canadian ports. On November 10, 1935, she arrived at a point on the high seas approximately 120 miles south of Saint Pierre at Miquelon. The libel alleges that the master of the vessel then, and on subsequent days in November, 1935, caused large quantities of Belgian alcohol to be unladen from the steamship, and caused the alcohol so unladen to be transshipped on other vessels including several speed boats, one of which was the British oil screw Pronto. The unlading, transshipment, and placing of the cargo were, it is so alleged, effected for the purpose of introducing the alcohol, or part thereof, into the United States without payment of customs duties. It is alleged that the place of transshipment on the high seas was adjacent to the customs waters of the United States and convenient for the purpose of unlawful importation into the United States.

Subsequently to the unlading, the British oil screw Pronto proceeded into the coastal and territorial waters of the United States and on January 20, 1936, while in the territorial waters of the United States, was seized in the vicinity of Charleston, S. C., by United States Coast Guard and customs officers. The Pronto then had on board a cargo of Belgian alcohol consisting of 765 cases containing 4,785 gallons which had been a part of the cargo of the steamship Reidun and which had been unladen from that vessel. Thereafter, on or about March 17, 1936, the Reidun, while at anchor in New York Harbor and within the port of New York, was seized by agents of the Collector of Customs for violation of the customs revenue laws of the United States, and the vessel is now in that customs collection district in the possession of the United States of America.

The libel alleges breach of the provisions of the Act of Congress of August 5, 1935, c. 438, and particularly of the provisions thereof contained in title 2, § 205, 49 Stat. 524 (U.S.Code, title 19, § 1586 (b), 19 U.S.C.A. § 1586(b), and title 2, § 208, 49 Stat. 526 (U.S.Code, title 19, § 483(a), 19 U.S.C.A. § 483(a). Two causes of forfeiture are stated. The first for violation of the provisions of the U.S. Code, title 19, § 1586(b), and section 483 (a), 19 U.S.C.A. §§ 483(a), 1586(b); the second cause of forfeiture is for violation of the provisions of U.S.Code, title 19, § 483(a), 19 U.S.C.A. § 483(a).

The pertinent provisions of U.S.Code, title 19, § 1586(b), 19 U.S.C.A. § 1586(b), are:

"(b) The master of any vessel from a foreign port * * * who allows any merchandise * * * which consists of any spirits, wines, or other alcoholic liquors, to be unladen from his vessel at any place upon the high seas adjacent to the customs waters of the United States to be transshipped to or placed in or received on any vessel of any description, with knowledge, or under circumstances indicating the purpose to render it possible, that such merchandise * * * may be introduced, or attempted to be introduced, into the United States in violation of law, shall be liable to a penalty equal to twice the value of the merchandise * *. * and the vessel from which the merchandise is so unladen, and its cargo * * * shall be seized and forfeited."

Section 483 of the same act provides in part as follows:

"*Forfeitures; penalty for aiding unlawful importation.*

"(a) All vessels, with the tackle, apparel, and furniture thereof, and all vehicles, animals, aircraft, and things with the tackle, harness, and equipment there-

of, used in, or employed to aid in, or to facilitate by obtaining information or otherwise, the unlading, bringing in, importation, landing, removal, concealment, harboring, or subsequent transportation of any merchandise upon the same or otherwise unlawfully introduced, or attempted to be introduced into the United States, shall be seized and forfeited."

The parties have stipulated that the place, approximately 120 miles south of Saint Pierre, Miquelon, where the unlading took place, was more than 500 miles and something less than 600 miles from the nearest point of the United States or any of its customs enforcement areas or customs waters; and that Charleston, S. C., where the British oil screw Pronto was seized, was more than 1,000 miles from the point 120 miles south of Saint Pierre, Miquelon. A part of the Treaty between Norway and the United States, entered into on May 24, 1924 (43 Stat. 1772), is included in the stipulation.

The critical question involved in the determination of the sufficiency of the libel is the meaning to be attached to the phrase, "adjacent to the customs waters of the United States." Was the place on the high seas at which the transshipment took place adjacent to the customs waters of the United States within the meaning of the act?

The statute became effective August 5, 1935, after the repeal of the Prohibition Act (41 Stat. 305), and, of course, was designed to make more rigid the exclusion of contraband liquors. The reports of the Committee on Finance of the United States Senate, and of the Committee of Ways and Means of the House of Representatives, disclose that the Treasury Department was much concerned over the alarming increase in alcohol smuggling and that defects in the then existing provisions of the revenue laws made it necessary to provide additional legislation. The provisions here in question relate to activities of carriers of contraband liquors hovering off the coast of the United States. Before the enactment of the Anti-Smuggling Act of 1935 (19 U.S.C.A. § 1701 et seq.) the activities of carriers of contraband liquor were not branded as a statutory offense so long as they took place without the four league limit established over a century ago. Therefore the act provides for the establishment of customs enforcement areas, in which smuggling vessels are found to be present, which are adjacent to but outside the 12-mile limit. Accordingly, section 1701(a), 19 U.S.C.A., of the act authorizes the President to establish such customs enforcement areas adjacent to customs waters. This important and novel section reads in part as follows:

"Whenever the President finds and declares that at any place or within any area on the high seas adjacent to but outside customs waters any vessel or vessels hover * * * and that, by virtue of the presence of any such vessel or vessels at such place or within such area, the unlawful introduction * * * into * * * the United States of any merchandise * * *. is being * * * occasioned, promoted, or threatened, the place or area so found and declared shall constitute a customs-enforcement area for the purposes of this chapter. Only such waters on the high seas shall be within a customs-enforcement area as the President finds and declares are in such proximity to such vessel * * * that such unlawful introduction * * * of merchandise * * *. may be carried on by * *. * such vessel."

There then follows some limitation with respect to the length and breadth of such enforcement area. It shall not include "waters more than 100 nautical miles" (i. e., 200 miles, 100 in either direction from the place or immediate area where the President declares such vessel or vessels are hovering) and shall not include "any waters more than 50 nautical miles outwards from the outer limit of customs waters."

■ It is, of course, now well settled that the customs waters of the United States include a strip of coastal waters extending outward 12 miles from low-water marks. Is it then reasonable to believe that the term "adjacent" as used in section 1586 (b), U.S.Code, title 19, 19 U.S.C.A. § 1586(b), can include a distance outward from the customs waters greater than that defined in section 1701(a)? The government submits that any area in the high seas from which, as has developed in familiar present practice, illicit spirits may be conveniently unladen and transshipped from one vessel to another for the purpose of facilitating smuggling into the United States, is "adjacent to our customs waters," in the sense and within the purpose of this statute. The statute itself, being of but recent enactment, has not been judicially interpreted. Reliance is had on Church v.

Hubbart, 2 Cranch (6 U.S.) 187, 2 L.Ed. 249, which it is urged holds that there is no fixed rule among the customs and usages of Nations which prescribes the limits of jurisdictional waters and that a Nation may exercise authority upon the high seas to such an extent and at so great a distance as is reasonable and necessary to protect its sovereignty.

But the question presented in the government's libel cannot quite be decided on the basis of such general doctrine for the libel sets forth the violation of a statute and recourse must be had for the interpretation of its provisions primarily to its context, and there seems to be ample therein by way of instruction to determine the meaning of the phrase "adjacent to the customs waters," even though the term "adjacent" itself is not defined in the act.

We find, for example, in section 1401 (m), 19 U.S.C.A., the term "customs waters" defined:

"(m) *Customs Waters.* The term 'customs waters' means, in the case of a foreign vessel subject to a treaty * * * between a foreign government and the United States enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon such vessel upon the high seas the laws of the United States, the waters within such distance of the coast of the United States as the said authorities are or may be so enabled * * * by such treaty * * * and, in the case of every other vessel, the waters within four leagues of the coast of the United States."

Thus "customs waters," as defined in this section, means, as to treaty nations, a distance equivalent to one hour's steaming distance and 4 leagues as to vessels of nontreaty nations.

■ Reverting then to the language of section 1586(b), the phrase, "upon the high seas adjacent to the customs waters" must mean the waters adjacent to 4 leagues of the coast or to one hour's steaming distance from the coast. Any other construction would raise the inquiry as to why "customs enforcement areas" should be set up.

Moreover, there seems to be reasonable ground for believing that section 1701(a) provides a means for determining what the phrase "adjacent to customs waters" must mean. The limitation upon the power delegated to the President in the establishment of a customs enforcement area is that such area shall not include any waters more than 50 nautical miles outwards from the outer limit of customs waters. It is thus unreasonable to believe that Congress intended that the term "adjacent" as used in section 1586(b) meant more than 50 miles from the outer customs limit.

■ As thus interpreted the place of transshipment defined in the libel is not within this limit. Nor is it within the limit defined in the existing treaty of May 24, 1924, entered into between the United States and Norway. Section 3 of article 2 of that Treaty (43 Stat. 1773) limits the exercise of the rights of search and seizure to a distance not greater than can be traversed in one hour by the vessel suspected of endeavoring to commit an offense against the United States.

■ Finally it may be observed that the Anti-Smuggling Statute, so far as treaty nations are concerned, was not intended to extend the jurisdictional rights of the United States beyond those agreed to with such treaty nations. Both Congressional committees in their reports on this bill, referring to section 1701, state:

"This section, at the same time, specifically prescribes as a fundamental principle of the bill the rights of foreign vessels under the various hour sailing distance liquor treaties. Except by a special arrangement with the treaty nation concerned, no treaty vessel can be seized under any provision of the bill beyond treaty limits."

The provision referred to is found in section 1701(b):

"Provided, That nothing contained in this section or in any other provision of law respecting the revenue shall be construed to authorize or to require any officer of the United States to enforce any law thereof upon the high seas upon a foreign vessel in contravention of any treaty with a foreign government enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon such vessel * * * the laws of the United States," etc.

Allegations of the ship's speed in the libel are wanting and there is no contention that the Reidun had a speed of 500 miles an hour.

Nor is there any allegation found in the libel that the point of transshipment was within any customs enforcement area; on the contrary, the stipulation of facts declares that point to be outside of the enforcement area.

Since, therefore, whatever the Reidun did could not have been the subject of search or seizure at the place indicated in the libel, it is impossible to see why the entry of the boat thereafter into the Port of New York should have subjected the vessel to seizure by the government and libel for forfeiture. Accordingly the exceptions are sustained.

Settle orders on notice.